IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

MICHAEL WILKINSON and
LINDA WILKINSON                                          PLAINTIFFS

VS.                            CIVIL ACTION NO. 5:05-cv-94(DCB)(JMR)

THE MAYOR AND ALDERMEN OF THE CITY OF
VICKSBURG; LAURENCE E. LEYENS, MAYOR;
GERTRUDE YOUNG, ALDERWOMAN; and SIDNEY
BEAUMAN, ALDERMAN, IN THEIR OFFICIAL
CAPACITIES; OFFICER SAMUEL CARTER;
OFFICER KEVIN WILLIAMS; DETECTIVE
SANDRA JOHNSON; OFFICER DAVON GREY;
CAPTAIN MARK CULBERTSON; DEPUTY CHIEF
RICHARD O'BANNON; and JOHN DOES 1-10

MEMORANDUM OPINION AND ORDER

     This matter is before the Court on the defendants[1] the City of

Vicksburg, Laurence E. Leyens, Gertrude Young, Sidney Beauman,

Samuel Carter, Sandra Johnson, Davon Grey, Mark Culbertson, and

Richard O. Bannon's motion for summary judgment **(docket entry 90)**,

and supplemental motion for summary judgment **(docket entry 106)**.

Having carefully considered the motions and responses, the briefs

of the parties, the applicable statutory and case law, and being

otherwise fully advised in the premises, the Court finds as

follows:

     In this case, the plaintiffs Michael Wilkinson and Linda

Wilkinson assert claims pursuant to 42 U.S.C. § 1983 for violation

---

[1] Defendant Kevin Williams was never served with process in
this action.

of their rights under the Fourth and Fourteenth Amendments of the United States Constitution, as well as Mississippi state law claims for wrongful arrest, false imprisonment, malicious prosecution, defamation, abuse of legal process, and intentional infliction of emotional distress.  The claims relate to the plaintiffs' arrest on June 10, 2004, for kidnapping their grandson.

A motion for summary judgment is appropriately granted when the moving party demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party has the initial burden of identifying relevant portions of the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

A contested fact is "material" when it has the potential to change the outcome of the case.  Ginsburg 1985 Real Estate P'ship v. Cadle Co., 39 F.3d 528, 531 (5th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  An issue is "genuine" if "the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party."  Id.  A motion for summary judgment is appropriately granted when the moving party demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  The moving party has the initial burden of identifying relevant portions of the record, including  the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

If the moving party sustains its burden, the burden shifts to the nonmoving party to show with "significant probative evidence" that a genuine issue as to a material fact actually exists. <u>Conkling v. Turner</u>, 18 F.3d 1285, 1295 (5th Cir. 1994).  To overcome summary judgment, the nonmoving party must do more than simply rely on the pleadings or merely rest "upon conclusory allegations, improbable inferences, and unsupported speculation." <u>Krim v. BancTexas Group, Inc.</u>, 989 F.2d 1435, 1449 (5th Cir. 1993). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The non-movant must "designate specific facts showing the existence of a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250.  "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." <u>Id</u>. at 252. Moreover, the nonmoving party must make a showing sufficient to establish the existence of an essential element of its case, an element on which it will bear the burden of proof at trial.

Celotex, 477 U.S. at 322.

In light of the facts presented by the nonmoving party, along with any undisputed facts, this Court must decide whether the moving party is entitled to judgment as a matter of law.  When deciding a motion for summary judgment, the evidence submitted by the nonmoving party is presumed valid, and all reasonable inferences that may be drawn from that evidence must be drawn in favor of the party opposing summary judgment.  Anderson, 477 U.S. at 255.  The district court, therefore, must not "resolve factual disputes by weighing conflicting evidence, ... since it is the province of the jury to assess the probative value of the evidence."  Kennett-Murray Corp. v. Bone, 622 F.2d 887, 892 (5th Cir. 1980).  Summary judgment is improper where the court merely believes it unlikely that the nonmovant will prevail at trial. National Screen Serv. Corp. v. Poster Exchange, Inc., 305 F.2d 647, 651 (5th Cir. 1962).  By contrast, summary judgment for the moving party is only proper when a rational jury, looking at the record as a whole, could not find for the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The relevant facts surrounding the plaintiffs' arrest, construed in the light most favorable to the plaintiffs, are as follows:

Linda and Michael Wilkinson are the parents of Johnathan Wilkinson.  Johnathan Wilkinson and Hope Embry are the unmarried

parents of Gage Wilkinson.   When Hope was three months pregnant, she moved in with Linda and Michael while Johnathan, who was fifteen, was off at boarding school.   A month before Gage was born, in January of 2000, Johnathan returned and he and Hope moved into a rental house his parents owned.   Six months after Gage was born, Hope moved out, leaving Gage with Johnathan.   She and Johnathan had an on-again off-again relationship until their final breakup in March of 2003.   Johnathan was Gage's primary caretaker, with his parents' help, and he kept Johnathan after the breakup, allowing Hope to see him whenever she wished.   Deposition of Linda Wilkinson, pp. 34-37.   Eventually, Hope hired an attorney and filed a petition for full custody of Gage.   Deposition of Jerry Campbell, p. 16.   Johnathan Wilkinson filed a cross-petition for custody.

While the custody proceedings were pending, there were several domestic disputes between Hope and Johnathan regarding custody of Gage Wilkinson.   Deposition of Hope Embry, pp. 38-40.   During this time, Hope called the Warren County Sheriff's office alleging that Johnathan had kidnapped Gage.   In a separate incident, on February 28, 2004, Hope took physical custody of Gage from Johnathan while Gage was getting his hair cut at her place of employment, Pemberton Hair Stylists.   She then called the Vicksburg Police accusing Johnathan and his parents of kidnapping Gage.   Deposition of Linda Wilkinson, pp. 18-22.   Vicksburg police officers came to the hair stylists' shop and asked Johnathan to leave, explaining to him that

since no custody order was in place, whichever parent had physical custody was entitled to keep Gage, and the officers could not interfere.  Deposition of Linda Wilkinson, p. 19.  Following that incident, Linda and Johnathan spoke with Mack Varner, Johnathan's attorney, and Deputy Chief Richard O'Bannon because they were concerned that Hope was leaving Gage in the care of several young men.  They were advised that if Johnathan ever picked up Gage from anyone other than Hope or the day care, he should call 911 and let the police know about it.  Deposition of Linda Wilkinson, pp. 25–28.  On March 3, 2004, Hope's attorney filed a Motion for Temporary Custody.  As of June 10, 2004, this motion had not been ruled upon.

On June 10, 2004, Johnathan planned to take off work at 11:00 a.m. to take his son with him on a trip to Jackson.  His mother was to pick up Gage from the day care and bring him to her office, where Johnathan would meet them.  At 11:00 a.m., Johnathan arrived at his mother's office.  Shortly after that he received a call from her letting him know that Gage was not at the day care, despite the arrangement they had with Hope.  She also told Johnathan that she and his father were having lunch together, and he decided to join them.  Deposition of Johnathan Wilkinson, pp. 16–20.  The three of them drove together in Linda's vehicle to the Vicksburg Wal–Mart. When they reached the parking lot, Linda saw Gage with Hope's boyfriend, Joseph Marquis.  Johnathan decided to take Gage with him to Jackson, as originally planned, but asked his father to get Gage

6

since he did not want a confrontation with Joseph.  Gage, who was four at the time, willingly went with his grandfather, who told Joseph that Johnathan wanted to take Gage with him.  Before they left, Linda rolled down her car window and told Joseph to tell Hope that Johnathan had picked up Gage.   Joseph said he would.  Deposition of Johnathan Wilkinson, pp. 21-26; Deposition of Linda Wilkinson, p. 44; Deposition of Michael Wilkinson, pp. 52-53.

Johnathan had his mother drop him and his son off at her office so that he could get his truck.  When he arrived at his mother's office, he attempted to call Hope at Pemberton Hair Stylists.  He tried two or three times but got a busy signal.  Meanwhile, Joseph had gone to Pemberton Hair Stylists.  At 11:38 a.m., Hope called 911 and reported that Gage had been kidnapped.  Six minutes later, at 11:44 a.m., Johnathan called 911, as he had been advised to do, and reported that he had picked up Gage from the Wal-Mart parking lot.  Deposition of Johnathan Wilkinson, pp. 26-27.  Johnathan was told by the dispatcher that someone had already called in to report the incident, and that an officer would call him back shortly.  Deposition of Johnathan Wilkinson, p. 33.

Vicksburg Police Officer Samuel Carter had responded to Hope's 911 call.  Upon arrival at Pemberton Hair Stylists, he was told by Joseph and Hope that Linda and Michael Wilkinson had taken Gage from Jospeh's custody without Hope's permission.  Deposition of Samuel Carter, p. 19; Vicksburg Police Offense Form 1.  He then

called Johnathan, who told him he had picked up Gage from Joseph and that there was no custody order giving either parent exclusive custody of Gage.  Officer Carter told Johnathan that he had picked up his son inappropriately.  Deposition of Johnathan Wilkinson, pp. 33-34; Deposition of Linda Wilkinson, p. 50.  Approximately eight to ten minutes later, Officer Carter called again, and asked Johnathan to bring Gage to the police station.  Deposition of Johnathan Wilkinson, p. 34.  Deposition of Linda Wilkinson, pp. 50-51.  Linda Wilkinson then called Mack Varner, who asked her to have Officer Carter call him.  Deposition of Linda Wilkinson, p. 51.  Officer Carter then called Linda's office a third time.  This time, Linda answered the phone and talked with him herself.  Officer Carter told her that Johnathan had picked up the child inappropriately because he did not have Hope's permission.  Linda explained that there was no custody order in place, and that Johnathan did not need Hope's permission.  She also told him about Hope's prior accusations of kidnapping, and asked him to call Mack Varner.  According to Linda, Officer Carter's response was, "You can have Mac or whoever he is call me.  In the meantime, I'm going to be working up some charges, kidnapping charges against you and your husband."  Deposition of Linda Wilkinson, pp. 51-52.

Officer Carter then called Mack Varner.  In his affidaivt, Attorney Varner states the following:

> When Officer Carter called me, I explained that a
> custody hearing was pending, no custody order was in

8

place, and that the child lived with his father in
Vicksburg and attended Lovie's Day Care Center.

I told Officer Carter that Ms. Embry had made
previous, similar calls to the police and Sheriff's
Department.

I explained to Officer Carter that Gage Wilkinson had
not been kidnapped and that he was safely in his father's
custody.

Officer Carter asked me if he [sic] would have the
Wilkinsons bring the child, Gage Wilkinson, to my office
at 2:00 p.m. so that the police could ensure the child
was safe and with his father. I agreed.

Affidavit of J. Mack Varner, ¶¶ 7-10. Varner then called Linda,

relayed to her his conversation with Officer Carter, and asked the

Wilkinsons to be at his office at 2:00 p.m. Affidavit of J. Mack

Varner, ¶ 11.

When the Wilkinsons arrived at the law office, Varner was in

court, but Attorney Lee Thames was there to talk to the police with

them. Thames assured them that the police simply wanted to make

sure that Gage was safe and with his father. In his affidavit,

Attorney Thames states the following:

Two Vicksburg Police Department officers arrived at my
office at approximately 2:15 p.m. on the afternoon of
June 10, 2004, and I was told the officers had a warrant
for Michael and Linda's arrest on kidnapping charges. I
was never shown the warrants.

I was also told by the officers that the child would
not be taken away from his father.

A female officer arrived at my office several minutes
later.

I explained to the officers that the child, Johnathan
Wilkinson's son, had not been kidnapped and that he was

safely in his father's custody.  I explained that the
child lived with his father in Vicksburg.

   Prior to the arrest of Linda and Michael Wilkinson, I
specifically told the officers that there was no custody
order in place regarding the child.

   Prior to the arrest of Linda and Michael Wilkinson, I
specifically told the officers that the child was with
his father.

   Prior to the arrest of Linda and Michael Wilkinson, I
specifically told the officers that the child had been
with his father and, therefore, there could not have been
any kidnapping.

   Prior to the arrest of Linda and Michael Wilkinson, I
specifically told the black female officer, whose name I
do not know, that the mother had no more legal right to
the child (Gage Wilkinson) than the father (Johnathan
Wilkinson).

    When the officers disclosed their intent to arrest
Michael and Linda Wilkinson, I specifically told the
officers that the arrest and taking the child away from
the father was over my objection.  One of the officers
responded, "Objection noted."

   Initially, the female officers [sic] verbally assured
me and the child's father that they were not going to
take the child away from him.

   I then witnessed the female officer verbally order the
child's father to turn the child over to her.  I told her
that turning the child over was not the purpose of the
meeting and she had no authority to take the child from
his father.  She told me she had to take the child to the
police station because his name was on the affidavit.  I
was told by the officers that they only wanted to ensure
the safety of the child and they were taking the child to
the police station.  The female officer proceeded to
physically pull the child away from the father as the
child cried and yelled for his father.

    Contrary to what the police officers told me, the
officers proceeded to take the child away from the
father, and I watched the female officer give the child
to the mother outside, in front of my office.

I witnessed the female officer threaten the child's
father that he was close to being arrested himself.

The officers verbally refused to allow me to drive
Michael and Linda Wilkinson to the police station, and
they insisted that the arrest be made at my office.

Immediately after the arrest of Michael and Linda
Wilkinson, I went to the Vicksburg Police Department to
speak with Deputy Chief O'Bannon about the Wilkinsons'
arrest.

In a conference room at the Vicksburg Police
Department, I talked with Deputy Chief O'Bannon and an
officer about the events that had transpired.  Deputy
Chief O'Bannon told me that the officers should not have
lied to me about the purpose of the meeting and should
not have told me they were only taking the child to the
police department to ensure his safety, when they had no
intent to do so and handed the child immediately over to
the mother.

While in the conference room at the police department,
Deputy Chief O'Bannon handed me his business card and
said "this is so you will spell my name correctly when
you sue me."

Affidavit of Lee D. Thames, Jr., ¶¶ b-r.  The officers present at

the law office were Samuel Carter, Kevin Williams, and Sandra

Johnson.[2]

In their complaint, the Wilkinsons claim that their Fourth

Amendment right to be free from an arrest without probable cause

was violated.  Specifically, they allege that their arrests were

not made pursuant to valid warrants and were made without probable

---

[2] It is not clear to the Court what roles defendants Davon
Grey and Mark Culbertson played; however, since the defendants have
not moved for summary judgment on the claims against them other
than collectively with the other defendants, the Court cannot
consider any individual defenses they may have.

cause.  Complaint, p. 5.  The Fourth Amendment's requirement that
"... no Warrants shall issue but upon probable cause, supported by
Oath or affirmation, and particularly describing ... the persons or
things to be seized ..." applies to arrest warrants.  <u>Giordenello
v. United States</u>, 357 U.S. 480 (1958).  Before a warrant for an
arrest can issue, the judicial officer issuing the warrant must be
supplied with sufficient information to support an independent
judgment that probable cause exists for the warrant.  <u>Whitley v.
Warden, Wyoming State Penitentiary</u>, 401 U.S. 560 (1971).  "[A]
'bare bones' affidavit is insufficient to establish probable
cause."  <u>United States v. Brown</u>, 941 F.2d 1300, 1303 (5th Cir.
1991).

Officer Kevin Williams applied for the warrants before Judge
Richard Bradford, III.  His only support for the warrants were two
identical affidavits of Hope Embry, one naming Michael Wilkinson
and the other Linda Wilkinson, which stated that the defendants

> did unlawfully, on or about the 10th day of June, A.D.
> 2004 within the corporate limits of [Vicksburg] did
> commit the offense of
>
> Kidnapping [97-3-53]
>
> Did willfully, unlawfully and feloniously without lawful
> authority kidnap Jonathan Gage Wilkinson with intent to
> cause him to be secretly confined against his will by
> snatching the child from his caretaker, Joseph Marquis as
> they exited Wal Mart.

Affidavits of Crystal Hope Embry.

The affidavits are conclusory, stating little more than that

the Wilkinsons perpetrated the offense charged.  The affidavits do not disclose that the alleged victim was a child, nor do they reveal that Hope is the mother of the child and the Wilkinsons his grandparents.  Mississippi law provides, in the case of a child under age 16, that it is a crime to forcibly seize, inveigle or kidnap such person "without lawful authority" and against the will of his parents.  Miss. Code Ann. § 97-3-53.  No mention is made of either of Gage's parents, nor whether the taking of the child was against their will, nor how the grandparents were acting "without lawful authority."  In addition, Judge Bradford testified in his deposition that whether the parents of a child were estranged, and whether there was a custody order, were material facts that he would want to know before issuing a warrant.  Deposition of Judge Richard Bradford, III, p. 14.

Probable cause cannot be made out by affidavits which are purely conclusory, stating only the affiant's belief that probable cause exists without detailing any of the "underlying circumstances" upon which that belief is based.  "Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police."  United States v. Ventresca, 380 U.S. 102, 108-09 (1965).  The Court finds that the affidavits of Hope Embry alone could not support the independent judgment of a disinterested magistrate.

The Supreme Court has held that qualified immunity does not protect a police officer who "seeks a warrant on the basis of an affidavit that does not show reasonably objective probable cause – even if the magistrate erroneously issues the warrant." <u>Kelly v. Curtis</u>, 21 F.3d 1544, 1555 (11th Cir. 1994)(citing <u>Malley v. Briggs</u>, 475 U.S. 335, 344–45 (1986)).  The test is whether a reasonably well-trained officer "would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.  If such was the case, the officer's application for a warrant was not so objectively reasonable, because it created the unnecessary danger of an unlawful arrest." <u>Malley</u>, 475 U.S. at 345 (footnote omitted).  The Court finds that the officers are not covered by qualified immunity concerning the validity of the warrant, because the affidavits omitted information material to a determination of probable cause, and this would have been known by a reasonably well-trained police officer.

As for Deputy Chief O'Bannon, the plaintiffs have not shown that he participated in the events or decisions leading up to the plaintiffs' arrests.  He also cannot be held liable for the acts of the individual officers.  <u>Thompkins v. Belt</u>, 828 F.2d 298, 303 (5th Cir. 1987).  He is therefore entitled to summary judgment.

The plaintiffs also allege a § 1983 municipal liability claim against the City of Vicksburg through its mayor and aldermen.  To establish municipal liability, the plaintiffs must prove that the

unconstitutional actions are the result of a policy or custom of
the municipality.  Monell v. Dept. of Social Servs., 436 U.S. 658
(1978).   The Wilkinsons claim that the officers' actions in
violating their constitutional rights were the result of customs
and policies of the Vicksburg Police Department, and of the City of
Vicksburg's failure to discipline and supervise officers.   In
support of their claim, the plaintiffs simply cite a previous case
against the City of Vicksburg which they allege involved false
arrest.   The plaintiffs do not, however, show how that case is
relevant to the facts of this case, nor do they show how that case
establishes a policy or custom involving failure to discipline and
supervise.   The City, its mayor and aldermen are entitled to
summary judgment.

     The plaintiffs assert various state law claims against the
defendants,   including   wrongful   arrest,   false   imprisonment,
malicious prosecution, abuse of legal process, and intentional
infliction of emotional distress.  To the extent that the
Wilkinsons have alleged common law tort claims against the officers
in their official capacity as Vicksburg police officers, these
claims are properly construed as having been made directly against
the City of Vicksburg under the Mississippi Tort Claims Act
("MTCA"), Miss. Code Ann. §§ 11-46-1, et seq.  See Miss. Code Ann.
§  11-46-5(1) ("[T]he immunity of the state and its political
subdivisions from claims for money damages arising out of ... the

15

torts of their employees while acting within the course and scope of their employment is hereby waived ....”); Miss. Code Ann. § 11-46-7(2)("[N]o employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee’s duties.”).   The MTCA is the exclusive remedy available to plaintiffs seeking money damages from the state or its political subdivisions.  Miss. Code Ann. § 11-46-7.

To establish a claim of false arrest or false imprisonment, a plaintiff must prove that the defendant caused him “to be arrested falsely, unlawfully, maliciously, and without probable cause.” Croft v. Grand Casino Tunica, Inc., 910 So. 2d 66, 75 (Miss. Ct. App. 2005)(citing City of Mound Bayou v. Johnson, 562 So. 2d 1212 (Miss. 1990)).  See also Parker v. Miss. Game & Fish Comm’n, 555 So. 2d 725, 728-79 (Miss. 1989).  Where probable cause exists for an arrest, there can be no false arrest claim.  Price v. Roark, 256 F.3d 364, 369 (5th Cir. 2001).  Because the defendants’ motion is based solely on the premise that probable cause existed for the issuance of the warrants, the Court must deny the motion, but shall do so without prejudice to allow a subsequent motion if appropriate.

To establish abuse of process, the plaintiffs must show (1) the party made an illegal and improper perverted use of the process, which was neither warranted nor authorized by the process; (2) the party had an ulterior motive or purpose for exercising such

illegal, perverted, or improper use of process; and (3) damages resulted from the perverted use of the process. <u>McClinton v. Delta Pride Catfish, Inc.</u>, 792 So.2d 968, 975 (Miss. 2001). The defendants argue that no ulterior motive or purpose has been alleged. The Wilkinsons claim, however, that the officers acted with the illegal objective of taking Gage away from his father and giving him to his mother. Because the parties do not brief this issue, summary judgment must be denied at this time.

A malicious prosecution claim requires: (1) the institution or continuation of original judicial proceedings, either criminal or civil, (2) by, or at the instance of the defendants, (3) the termination of such proceedings in the plaintiffs' favor, (4) malice in instituting the proceedings, (5) want of probable cause in the proceedings, and (6) the suffering of damages as a result of the action or prosecution complained of. <u>Allred v. Moore & Peterson</u>, 117 F.3d 278, 283 (5th Cir. 1997). The defendants show that the criminal complaint was instituted by Hope Embry, not the defendants, and that all charges were eventually dropped by Hope. However, the plaintiffs contend that the defendants played a role in the prosecution for a purpose other than that of bringing an offender to justice, namely to return Gage to his mother. Since this issue has not been briefed, summary judgment shall not be granted.

As for the plaintiffs' intentional infliction of emotional

distress claim, the Mississippi Supreme Court has held that "conduct so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized society" is required.  Wong v. Stripling, 700 So.2d 296, 306 (Miss. 1997)(quoting Morrison v. Means, 680 So.2d 803, 806 (Miss. 1996)).  The defendants assert that hurt feelings, mere insults, indignities, threats, annoyances, petty oppression, or other trivialities are not enough to impose liability.  The plaintiffs have alleged an improper motive on the part of the defendants, to deprive them of their grandson.  As the issue is not briefed, the defendants' motion shall be denied.

Finally, the plaintiffs' defamation claim has not been pursued by the plaintiffs in their brief following the defendants' argument for its dismissal.  Therefore, this claim is waived and summary judgment shall be granted.  See Dubose v. Oustalet, 738 F.Supp. 188, 189 n.1 (S.D. Miss. 1990).

Accordingly,

IT IS HEREBY ORDERED that the defendants' motion for summary judgment **(docket entry 90)**, and supplemental motion for summary judgment **(docket entry 106)** are GRANTED IN PART AND DENIED IN PART as follows:

Summary judgment is granted as to all claims against Laurence E. Leyens, Gertrude Young, Sidney Beauman, and Richard O. Bannon, and said claims are dismissed with prejudice;

18

Summary judgment is granted as to the § 1983 claim and the defamation claim against the City of Vicksburg, and said claims are dismissed with prejudice;

Summary judgment is denied as to the remaining claims against the City of Vicksburg;

Summary judgment is granted as to the defamation claims against Samuel Carter, Sandra Johnson, Davon Grey and Mark Culbertson, and said claims are dismissed with prejudice;

Summary judgment is denied as to the remaining claims against Samuel Carter, Sandra Johnson, Davon Grey and Mark Culbertson.

SO ORDERED, this the 30th day of March, 2007.

S/DAVID BRAMLETTE
UNITED STATES DISTRICT JUDGE